| | |
|---|---|
| THE LEGAL AID SOCIETY | KAYE SCHOLER LLP |
| Seymour James, Attorney-in-Chief | Scott D. Talmadge, Esq. |
| Adriene Holder, Attorney-in-Charge, | Holly M. Martin, Esq. |
|     Civil Practice | Kara E. Neaton, Esq. |
| Karen Cacace, Director, | 250 West 55th Street |
|     Employment Law Unit | New York, New York 10019-9710 |
| Richard Blum, of counsel | Tel:  212-836-8000 |
| 199 Water Street | scott.talmadge@kayescholer.com |
| New York, New York 10038 | |
| Tel:  212-577-3648 | |
| Fax:  646-616-4648 | |
| rblum@legal-aid.org | |

*Attorneys for Sonam Gyalpo*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:

HOLBROOK DEVELOPMENT CORP.,

                Debtor.

SONAM GYALPO,

                Appellant,

       -against-

HOLBROOK DEVELOPMENT CORP.,

                Appellee.

Chapter 11

2:16-cv-03818-JFB

------------------------------------------------------------------------x

## **APPELLANT'S OPENING BRIEF**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

JURISDICTION .............................................................................................................................2

STANDARD OF REVIEW .............................................................................................................2

ISSUES ON APPEAL ....................................................................................................................2

STATEMENT OF FACTS .............................................................................................................2

    A.    PROCEDURAL HISTORY ...........................................................................................2

    B.    FACTS ............................................................................................................................3

        1.    Mr. Gyalpo Was Hired To Work For The Gas Station Enterprise ..............3

        2.    Mr. Gyalpo Became A "Floater" Cashier ....................................................4

        3.    Mr. Gyalpo's Hours Were Logged On Time Sheets And He Was Paid In Cash By The Manager Or Another Gas Station Employee .........................5

        4.    Mr. Gyalpo Was Not Paid For All Hours Worked .......................................5

ARGUMENT ..................................................................................................................................6

I.    THE BANKRUPTCY COURT APPLIED THE WRONG LEGAL STANDARD TO DETERMINE WHETHER DEBTOR OWED MR. GYALPO WAGES UNDER THE FLSA AND NYLL ....................................................................................................................6

    A.    Mr. Gyalpo Was Employed By The Debtor .................................................................7

        1.    Employment Under The FLSA And NYLL .................................................7

        2.    Mr. Gyalpo's Employment ............................................................................8

    B.    Mr. Gyalpo Was Jointly Employed By Debtor And The Other Gas Stations Under The FLSA And NYLL ......................................................................................................10

        1.    Joint Employment Under The FLSA And NYLL ......................................10

        2.    Mr. Gyalpo's Joint Employment .................................................................13

II.    THE BANKRUPTCY COURT APPLIED LEGALLY INCORRECT BURDENS OF PROOF ..................................................................................................................................14

    A.    The Debtor Failed To Meet Its Burdens Of Proof Under FLSA And NYLL ...........15

    B.    The General Manager Was Unable To Establish That The Time Records Produced Reliably Reflected The Work Of Floaters ..................................................................15

CONCLUSION .............................................................................................................................18

**PRELIMINARY STATEMENT**

Creditor Sonam Gyalpo ("Mr. Gyalpo") worked as a cashier for an enterprise of gas stations that included the debtor Holbrook Development Corporation ("the Debtor" or "Holbrook"), among many others.  Mr. Gyalpo often worked as a "floater," assigned to any of a variety of gas stations.  The record below is clear that Mr. Gyalpo (i) was paid in cash by the manager of the gas stations; (ii) was not always paid the minimum wage; and (iii) was never paid overtime or spread-of-hours pay as required under federal and/or state labor law.  Moreover, Mr. Gyalpo was not paid at all for the last weeks that he worked for the gas stations, specifically at the Debtor's gas station.

To obtain the wages that he was owed, Mr. Gyalpo filed a proof of claim in the Debtor's chapter 11 proceeding, because Holbrook was one of the gas stations at which he worked.  Nevertheless, the Bankruptcy Court disallowed his claim.  Declining to apply the Fair Labor Standards Act ("FLSA") or New York Labor Law ("NYLL") to determine if Mr. Gyalpo had stated a valid wage claim, the Bankruptcy Court created its own standards at odds with the labor statutes.  In particular, the Bankruptcy Court held that Mr. Gyalpo had not established that he had been an employee of the Debtor because he had not been hired, paid, or supervised according to company protocols and that the actions of Sudheer Kumar, the individual employed by the Debtor to manage the Debtor's business (the "Manager"), in supervising and paying Mr. Gyalpo could not bind the Debtor.

This holding is an error of law.  It substitutes the correct legal standard for determining employment under federal and state labor law, whether one was "suffered or permitted to work," with an arbitrary standard with no legal foundation.  The holding ignores well-established precedent concerning joint employment under the FLSA and NYLL, and relies on inaccurate

1

characterizations of the record and misplaced burdens of proof. Accordingly, the Bankruptcy Court's ruling should be reversed and an order entered allowing Mr. Gyalpo's claim in full.

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1). The Bankruptcy Court's Order is a final appealable order.

## STANDARD OF REVIEW

On appeal from a bankruptcy court, a district court must review findings of fact for clear error, while it must review issues of law *de novo*. *See In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003); *Holzer v. Barnard*, No. 15-6277, 2016 WL 4046767, *4 (E.D.N.Y. July 27, 2016); *In re Abir*, No. 09-2871, 2010 WL 1169929, *4 (E.D.N.Y. Mar. 22, 2010).

## ISSUES ON APPEAL

1.  Whether the Bankruptcy Court erred by failing to apply the standards set forth in the Fair Labor Standards Act and New York Labor Law to Mr. Gyalpo's evidentiary burden.

2.  Whether the Bankruptcy Court erred in concluding the Debtor's evidence was sufficient to satisfy its burden of proof.

## STATEMENT OF FACTS

### A. PROCEDURAL HISTORY

On December 24, 2014, the Debtor filed a petition seeking relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Initially, the Debtor's case was jointly administered with several other debtor entities, all owned and operated by Steven Keshtgar (the "Owner"), which operated as a joint enterprise (the "Gas Station Enterprise"). On July 21, 2015, many of those cases were converted to chapter 7 cases (those cases have now been substantively consolidated together with several other of the Owner's bankrupt gas stations which originally

filed petitions under chapter 7 of the Bankruptcy Code) and this case proceeded as a chapter 11 case. On March 18, 2015, Mr. Gyalpo filed a proof of claim in the amount of $25,161.32 (the "Proof of Claim"). *See* RA 1, Claim No. 15-1.

On November 9, 2015, the Debtor filed the Debtor's Objection to Allowance of Claim (the "Objection") [RA 2] alleging that, based on the Debtor's records, the Claimant was at no time employed by the Debtor.

The Claimant filed an opposition to the Objection on December 24, 2015 (the "Opposition") [RA 3] noting that the Debtor's records do not match his own and that he was in fact employed by the Debtor as described in the Proof of Claim.

On March 14, 2016, the Bankruptcy Court held an evidentiary hearing (the "Evidentiary Hearing") to decide the status of Mr. Gyalpo's claim and the claim of Mr. Sohail Muhammad against Motor Parkway Development Corp., another entity within the Gas Station Enterprise. *See* RA 26, Hearing Transcript for hearing on March 14, 2016 ("Evid. Hr'g Tr."). At the Evidentiary Hearing, direct testimony was introduced by way of declaration, and cross-examination and rebuttal testimony were elicited at such hearing.

On June 21, 2016, the Bankruptcy Court conducted a ruling conference, during which the Court set out the basis for its ruling on Mr. Gyalpo's and Mr. Muhammad's claims. On June 23, 2016, the Court entered an order disallowing Mr. Gyalpo's claim [RA 30] and an appeal was taken.

    **B.**    **FACTS**

        **1.**    **Mr. Gyalpo Was Hired To Work For The Gas Station Enterprise**

Sonam Gyalpo worked as a gas station cashier for several gas stations within the Gas Station Enterprise. RA 9, Declaration of Sonam Gyalpo ("Gyalpo Decl.") ¶ 2. He worked for the Gas Station Enterprise from approximately November 2013 to January 2015, except for one

3

month at the end of 2014.  *Id*.  Mr. Gyalpo was hired by the Manager, RA 9, Gyalpo Decl. ¶ 3, who was responsible for managing the Debtor.  RA 21, Affidavit of Saverio Settanni ("Settanni Aff.") ¶ 26.  Mr. Gyalpo understood that the Owner was his boss.  RA 26, Evid. Hr'g Tr. 74:21-22.

Mr. Gyalpo was initially hired in November 2013 to work at the Centereach gas station.  RA 9, Gyalpo Decl. ¶¶ 2-3.  For approximately six months, Mr. Gyalpo worked the night shift at the Centereach gas station while the regularly-scheduled worker was absent.  RA 9, Gyalpo Decl. ¶ 3.  While Mr. Gyalpo was working at Centereach station, the Owner came to the gas station and told Mr. Gyalpo that he needed to "do a nice job and be sincere."  RA 9, Gyalpo Decl. ¶ 2.  Typically, Mr. Gyalpo worked a twelve-hour shift, from 8:00 p.m. to 8:00 a.m.  *Id*.  His job duties included working the register, cleaning, completing paperwork for the gas station and taking inventory. RA 9, Gyalpo Decl.  ¶ 4.  During each shift, Mr. Gyalpo also reported the gas reading to someone called "Rouf" in the main office of the Gas Station Enterprise.  RA 9, Gyalpo Decl. ¶ 5.

### 2.     Mr. Gyalpo Became A "Floater" Cashier

When the regularly-scheduled night worker at Centereach station returned to working his shift, the Manager told Mr. Gyalpo that he would get Mr. Gyalpo other jobs at other gas stations within the Gas Station Enterprise.  RA 9, Gyalpo Decl. ¶ 6.  Though Mr. Gyalpo did not hear from the Manager for several weeks, the Manager eventually made Mr. Gyalpo a "floater" cashier, meaning that Mr. Gyalpo would fill in at various gas stations when a worker was absent. RA 9, Gyalpo Decl. ¶ 7.  As a floater, Mr. Gyalpo's typical shift ran from 7:00 p.m. to 7:00 a.m. at the Gas Station Enterprise locations in Centereach, Smithtown, Ronkonkoma, Hauppauge, Patchogue, and Holbrook.  RA 9, Gyalpo Decl. ¶¶ 8, 10.  When a gas station within the Gas Station Enterprise needed someone to fill in, the Manager or someone named Sujay, would call

Mr. Gyalpo and tell him which gas station he should report to work at. RA 9, Gyalpo Decl. ¶ 9. Mr. Gyalpo would work anywhere from 12 to 96 hours per week at the Gas Station Enterprise. RA 9, Gyalpo Decl. ¶ 11. Typically, the Manager would sign off on the time records showing how many hours Mr. Gyalpo worked each week. *Id*.

In late 2014, Mr. Gyalpo worked for several weeks at a different gas station that was not part of the Gas Station Enterprise. RA 9, Gyalpo Decl. ¶ 12. But in January 2015, the Manager asked Mr. Gyalpo to work at the Debtor's gas station. RA 9, Gyalpo Decl. ¶ 13. Mr. Gyalpo worked for the last few weeks that the gas station was open, but did not fill out any weekly schedule forms during that time. *Id*.

### 3. Mr. Gyalpo's Hours Were Logged On Time Sheets And He Was Paid In Cash By The Manager Or Another Gas Station Employee

In all the time that Mr. Gyalpo worked at the Gas Station Enterprise, he was never instructed to use a hand scanner. RA 9, Gyalpo Decl. ¶ 14. He was never assigned a number by any of the gas stations to use on a time clock. RA 26, Evid. Hr'g Tr. 74:1-2. Typically, the day shift worker and Mr. Gyalpo would report their hours by filling out the timesheet, which was then picked up by the Manager. RA 26, Evid. Hr'g Tr. 71:6-20, 80:1-82:2. Saverio Settanni, a general manager for the Gas Station Enterprise (the "General Manager"), also testified that he received these handwritten timesheets from the Manager. RA 26, Evid. Hr'g Tr. 91:4-7. Mr. Gyalpo was often paid by the Manager or by Sohail Muhammad. RA 26, Evid. Hr'g Tr. 71:21-73:13, 80:20-22. The General Manager also "heard" that Mr. Gyalpo was being paid for his work at the gas stations by the Manager. RA 21, Settanni Aff. ¶ 26.

### 4. Mr. Gyalpo Was Not Paid For All Hours Worked

Mr. Gyalpo did not receive any wages or pay for his first week of work. RA 9, Gyalpo Decl. ¶ 15. He was told by the Manager that he would not be paid because that time was a

5

"training period." *Id*. For three or four weeks after the "training period," the Manager paid Mr. Gyalpo $480 or $490 per week in cash off the books. RA 9, Gyalpo Decl. ¶ 16. After that, Mr. Gyalpo did not receive his pay on time. It was often delayed by two or three weeks, and sometimes docked for alleged missing inventory or shortages in the register. RA 9, Gyalpo Decl. ¶¶ 17-19. Mr. Gyalpo received no wages from approximately August 2014 to November 2014 and also during January 2015. RA 9, Gyalpo Decl. ¶ 20.

As asserted in the Proof of Claim, the Debtor owes Mr. Gyalpo $25,161.32 for unpaid wages, liquidated damages and notice and wage violations. Of that amount, $10,201.44 is a priority wage claim pursuant to Section 507(a)(4)(A) of the Bankruptcy Code.

## ARGUMENT

I. **THE BANKRUPTCY COURT APPLIED THE WRONG LEGAL STANDARD TO DETERMINE WHETHER DEBTOR OWED MR. GYALPO WAGES UNDER THE FLSA AND NYLL**

In disallowing Mr. Gyalpo's claim, the Bankruptcy Court declared that "while . . . Mr. Gyalpo . . . go[es] to great lengths in discussing in [his] briefing the FLSA and New York Labor [Law] standards, [he] simply ha[s] not demonstrated how . . . Mr. Gyalpo was an employee or individual, as defined under Section 507(a)(4), as to Holbrook . . ., and simply ha[s] not proven that [he] was an employee of the entity against which the claim was asserted." RA 29, Transcript of Ruling Conference dated June 21, 2016 ("Ruling Tr.") at 18. This conclusion is plainly erroneous as a matter of law. Section 507(a)(4) of the Bankruptcy Code identifies that people with certain wage claims have a certain priority under the Bankruptcy Code. It does not establish independent criteria for deciding whether a person has a wage claim. Whether a person has a wage claim under the FLSA or the NYLL depends entirely on the FLSA and the NYLL, even in the context of a bankruptcy proceeding. *See, e.g., In re Santos*, 2007 WL 7540980, at *5

6

(B.A.P. 9th Cir. 2007) ("In evaluating the burden of proof, the Bankruptcy Court properly looked to the law of California as the applicable law for wage disputes in that state.").

The Bankruptcy Court committed reversible error by disregarding the labor law standards set forth in the FLSA and NYLL for determining employment, and instead erroneously applied principles of agency law. It was error to disregard the standards established under those laws. Under the FLSA and NYLL, the agency principles applied by the Bankruptcy Court in this case are not the correct legal standards to determine whether someone was employed by a given employer. Those statutes have completely different labor law standards for determining employment, and it was error not to apply those standards. As demonstrated below, under those labor law standards, Mr. Gyalpo was employed by and has a valid wage claim against the Debtor.

### A. Mr. Gyalpo Was Employed By The Debtor

#### 1. Employment Under The FLSA And NYLL

The FLSA's definition of the employment relationship famously is broad, both explicitly and in its interpretation. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947) ("The [FLSA] definition of 'employ' is broad."); *U.S. v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (quoting Sen. Hugo Black 81 Cong. Rec. 7657 (1938)) (noting that the FLSA standard for "employee" "'had been given 'the broadest definition that has ever been included in any one act'"); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66 (2d Cir. 2003) ("[The definition of 'employ' under the FLSA] is necessarily a broad one, in accordance with the remedial purpose of the FLSA.").

Under the FLSA, "'[e]mploy' includes to suffer or permit to work." 29 U.S.C. § 203(g) (2015). An employee is "any individual employed by an employer." 29 U.S.C. § 203(e)(1) (2015). An employer is "any person acting directly or indirectly in the interest of an employer in

7

relation to an employee." 29 U.S.C. § 203(d) (2015). The definition is independent of common law or other employment law definitions. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) ("This [definition of "employ" under the FLSA], whose striking breadth we have previously noted . . . stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."); *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 146 (2d Cir. 2008) (quoting *Zheng*, 355 F.3d at 66) (finding that nurse employed by multiple staffing agencies for work at the same hospital was employed by that hospital under the FLSA and stating that the "broad" definition of "employ" under the FLSA requires a court to "'look[] beyond a defendant's formal control over the physical performance of a plaintiff's work'"). Thus, formal recognition of the employment relationship by the putative employer is not required for the employer to be subject to the requirements of the FLSA.

Federal courts generally have found liability for New York Labor Law violations to track liability under the FLSA. *See, e.g., Galeana v. Lemongrass on Broadway Corp.*, 2014 WL 1364493, at *15 (S.D.N.Y. Apr. 4, 2014). Under the New York Minimum Wage Act, NYLL Article 19, §651(5), "'employee' includes any individual employed or permitted to work by an employer in any occupation . . . ."

    2.    **Mr. Gyalpo's Employment**

Under the FLSA, Mr. Gyalpo was employed by the Debtor. He was permitted, let alone suffered, to perform work for the Debtor as a cashier. In that job, he worked the register, cleaned, completed paperwork for the Debtor, and took inventory, among other duties. RA 9, Gyalpo Decl. ¶ 4. He performed these tasks with the direct knowledge of the Owner and the Manager. RA 9, Gyalpo Decl. ¶ 2. He had regular communications with the main office of the Gas Station Enterprise. RA 9, Gyalpo Decl. ¶ 5. Even the General Manager, while disclaiming

8

any prior knowledge of Mr. Gyalpo or his work at the Gas Station Enterprise, conceded that he had heard that Mr. Gyalpo had been paid by the Manager when he filled in for shifts of employees of the Debtor.  RA 21, Settanni Aff. ¶ 26; RA 26, Evid. Hr'g Tr. at 86:3-7.[1]  Since Mr. Gyalpo was suffered and permitted to perform work for the Debtor, he was "employed" by it, and it is liable for any violations of his rights under the FLSA.

Contrary to the Bankruptcy Court's decision, under the FLSA's "suffer or permit to work" standard, neither the Owner nor any of his staff had to give formal approval to Mr. Gyalpo's employment or how he was paid to create liability on the part of the Debtor.  Any other approach would completely subvert the purpose of the labor law—to protect employees who do not have the bargaining power to protect themselves against violations of minimum standards.  If employers were only liable under the FLSA if they formally acknowledged employment and how employees are paid, unscrupulous employers who wish to evade minimum wage and overtime requirements simply would not acknowledge employment or payment of wages.  The laws, however, offer employers no legal defense based on those subterfuges.

Nevertheless, the Bankruptcy Court held that Mr. Gyalpo "did not establish that [the Manager] could or did bind Holbrook to pay Mr. Gyalpo off the books or outside the standard scanning protocol."  RA 29, Ruling Tr. at 16.  The Bankruptcy Court's premise legally is incorrect.  The Bankruptcy Court was applying common law agency principles to determine employment instead of applying the appropriate labor laws' standards.  As noted above, the Supreme Court has rejected use of the common law in determining employment status under the FLSA.  Therefore, the Bankruptcy Court's decision should be reversed.

---

[1] As discussed below, the Debtor did not even proffer documents to dispute that Mr. Gyalpo had worked at the Centereach gas station in 2013.  RA 26, Evid. Hr'g Tr. at 96:14-25.

9

B.  **Mr. Gyalpo Was Jointly Employed By Debtor And The Other Gas Stations Under The FLSA And NYLL**

1.  **Joint Employment Under The FLSA And NYLL**

Under the FLSA's broad definitions of employment, one or more employers may jointly employ an employee. 29 C.F.R. § 791.2(a) (2016) (discussing joint employment). Each joint employer is jointly and severally liable for any and all FLSA violations suffered by a jointly-employed employee during that employee's employment with any joint employer, although entities remain separate corporate entities in other areas of the law. *Id*. According to applicable regulations:

> if the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act. In this event, *all joint employers are responsible, both individually and jointly, for compliance* with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek.

*Id.* (emphasis added). *See also Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193, 198 (2005) ("There is well-established authority under this theory that . . . an employee . . . may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer.") (citation omitted); *see also Chao v. Barbeque Ventures, LLC*, No. 8:06CV676, 2007 WL 5971772, at *4 (D. Neb. Dec. 12, 2007) *aff'd*, 547 F.3d 938 (8th Cir. 2008) (assessing single employer theory to determine liability for overtime payments); *Juarez v. 449 Restaurant, Inc.*, 29 F. Supp. 3d. 363, 367 (S.D.N.Y. 2014) (specifying that the "single integrated enterprise" test assesses single employer status for FLSA purposes for otherwise separate entities). Joint employment gives rise to joint

10

and several liability by the Debtor and other gas stations in the Gas Station Enterprise for both federal and state labor law violations.

As noted above, federal courts generally have found liability for NYLL violations to track liability under the FLSA. *See, e.g., Galeana*, 2014 WL 1364493, at *15; *see also Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 342-43 (S.D.N.Y. 2005) (stating that the New York Labor Law definition of "employer" is "similarly expansive" when compared to the FLSA and holding that corporate owner was jointly and severally liable for labor law violations under FLSA and New York Labor Law); *see also Bonito v. Avalon Partners, Inc.*, 106 A.D.3d 625 (1st Dep't 2013) (reinstating claim of joint employer liability for individual who partly owned and managed the employer's business).

Whether joint employment exists "depends upon all the facts in the particular case." 29 C.F.R. § 791.2(a) (2016). The United States Department of Labor (the "DOL") identifies the three following situations as situations in which joint employment exists: (1) where an arrangement exists to share or exchange employees; (2) where employers act in each other's interest in relation to the employee; or (3) where employers are "not completely dissociated" and "may be deemed to share control of the employee." 29 C.F.R. § 791.2(b) (2016). *See also Barfield*, 537 F.3d 132, 140-41 (finding and discussing implications of joint employment for overtime); *Terry v. Spinelli*, 980 F. Supp. 2d 366, 375 (E.D.N.Y. 2013) (concluding that "no reasonable jury" could find absence of joint employment even where joint employer did not formally control employee).

The DOL recently issued guidance on how to evaluate claims of joint employment, including "horizontal" joint employment where different seemingly distinct businesses either form a single enterprise or are considered joint employers. *See* U.S. Dep't of Labor Wage &

Hour Div., Adm'rs Interpretation No. 2016-1: Joint Employment Under the Fair Labor Standards Act and Seasonal Agricultural Worker Protection Act, 7 (issued Jan. 20, 2016), *available at* http://www.dol.gov/whd/flsa/Joint_Employment_AI.pdf, at 6-9 (describing factors for horizontal joint employment and addressing joint employment generally) (the "DOL Guidance").

Where, as here, companies do not stand in a hierarchical relationship and jointly employ an employee, the DOL calls the arrangement "horizontal" joint employment. Horizontal joint employment tests focus on the interrelatedness of operations and, while no one factor is dispositive in analyzing joint employment, this test may consider ownership, overlapping management, control over operations, inter-mingling (including administrative operations), supervision, supervisory authority, common employees, shared clients or customers and agreements between employers. *Juarez*, 29 F. Supp. 3d at 366-68 (finding that facts pled alleged joint employment when considering interrelation of operations, centralized control of labor relations, common management, and common ownership or financial control and stating that chain of restaurants and chain operator were "not insulate[d] from liability . . . because all Defendants that compose the enterprise count as Plaintiff's employer"); *Bravo v. Established Burger One, LLC*, No. 12 CIV. 9044 CM, 2013 WL 5549495, at *8 (S.D.N.Y. Oct. 8, 2013) (finding joint employment relationship was alleged where corporate defendants "moved employees and food among restaurants," paid employees using similar methods and from the same office, jointly advertised, and managed burger restaurants as one entity); *Chen v. TYT E. Corp.*, No. 10 CIV. 5288 PAC, 2012 WL 5871617, at *3-5 (S.D.N.Y. Mar. 21, 2012) (granting summary judgment for plaintiffs where corporate owners were considered a single entity for purposes of the FLSA where restaurants were commonly managed, shared some physical spaces, and jointly operated labor relations or where an economic realities test was used); *Perez v.*

*Westchester Foreign Autos, Inc.*, No. 11 CIV. 6091 ER, 2013 WL 749497, at *6-8 (S.D.N.Y. Feb. 28, 2013) (failing to grant motion to dismiss where chain of car dealerships and corporate officers were a single employer for the purposes of the FLSA).

### 2. Mr. Gyalpo's Joint Employment

Under the applicable test for joint employment under the FLSA, the Debtor was Mr. Gyalpo's employer and joint employer and is liable for all FLSA violations Mr. Gyalpo suffered while he worked for the Debtor and all other entities within the Gas Station Enterprise.

The Debtor and the other gas stations in the Gas Station Enterprise at which Mr. Gyalpo worked, together with Marketing Inc. of Islandia, present a textbook case of joint employment. *See, e.g., Juarez,* 29 F. Supp.3d at 370-71 (applying standard four-part test of "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control" in finding multiple diners with different owners to be a "single integrated enterprise," emphasizing that the plaintiff worked at all of the locations at issue and "did not differentiate among them with respect to the pay policies he was subject to") (citations omitted). All of the factors in *Juarez* favor finding joint employment here: (1) the Owner ultimately owned all of the gas stations; (2) the Owner, with the assistance of the General Manager and the Manager, and through Marketing Inc. of Islandia, ran all of the gas stations, *see, e.g.,* RA 26, Evid. Hr'g Tr. 84:5-7; (3) the Owner, with the assistance of the Manager, had control over all of the gas stations and ran them as one enterprise, including transferring funds from one gas station to another to cover payroll, *see, e.g.,* RA 26, Evid. Hr'g Tr. 74:16-75-6, 82:14-20; and (4) the operations were financially intermingled[2] and staff was shared, including

---

[2] For example, in Debtor's Exhibit 4 [RA 28], the handwritten weekly schedule for the week ending November 7, 2014, shows that three employees—"Santosh", "Kumar Sharma", and "Sujay"—worked at the Centereach gas station during that week. Yet, only two of those employees' paycheck stubs are included in the records for this time period. The General Manager speculated that this was this discrepancy was because the third employee, a gas

13

Mr. Gyalpo, who was dispatched to any of a variety of gas stations within the Gas Station Enterprise, *see, e.g.,* RA 9, Gyalpo Decl. ¶ 2. *See also* DOL Guidance at 8. Clearly, these operations were far beyond the "not completely dissociated" joint employment criterion adopted by the DOL and, indeed, were highly integrated.

The Bankruptcy Court did not apply the FLSA and NYLL's joint employment liability standards. Instead, the Bankruptcy Court applied agency standards, holding that Mr. Gyalpo did not establish that the Manager had the authority to pay him off the books or by doing so, bind the Debtor. As set forth above, those questions are legally irrelevant to the question of joint employment liability under the FLSA and NYLL.

In sum, under the FLSA and NYLL, Mr. Gyalpo established that the Debtor and the other gas stations to which he was dispatched by the Debtor's Owner and the Manager were his joint employers under the FLSA and NYLL and that they are all jointly and severally liable for any violations under those acts.[3] The Bankruptcy Court's holding to the contrary was legally erroneous and should be reversed.

## II.   THE BANKRUPTCY COURT APPLIED LEGALLY INCORRECT BURDENS OF PROOF

The Bankruptcy Court failed to follow the FLSA and NYLL rules concerning burdens of proof in the absence of contemporaneous accurate wage and hour records. In disallowing Mr. Gyalpo's claim, the Bankruptcy Court relied on several factual findings that were not established on this record. It is not enough for the Debtor's witness to have asserted factual claims. If their evidence is demonstrably unreliable, it does not satisfy the Debtor's burden of proof.

---

station employee, worked at different locations and was paid by some other location. RA 26, Evid. Hr'g Tr. 96:2-13.

[3] Of course, Mr. Gyalpo is only seeking to recover the total amount he is owed and is not seeking and would not be entitled to multiple recoveries of the total amount owed.

14

### A. The Debtor Failed To Meet Its Burdens Of Proof Under FLSA And NYLL

FLSA and NYLL shift the burden onto the employer to disprove the employee's claims of unpaid wages in the absence of accurate contemporaneous wage and hour records. Under the foundational Supreme Court FLSA precedent, *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 687 (1946), where an employer cannot produce the contemporaneous and accurate time and pay records that the law requires it to maintain, a FLSA plaintiff meets his burden of proof "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Mr. Gyalpo met that burden in his Proof of Claim and with his declaration. RA 1, 9. "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687. The Debtor has failed to meet that burden. As set forth below, by the General Manager's own admission, the time records produced by the Debtor were not reliable. Therefore, the burden rested with the Debtor to disprove Mr. Gyalpo's testimony.[4] It utterly failed to do so.

### B. The General Manager Was Unable To Establish That The Time Records Produced Reliably Reflected The Work Of Floaters

In response to Mr. Gyalpo's submission of time records with his name and hours signed by the Manager, the Debtor offered competing time records, including hand scanner records. However, in the end, the General Manager had to concede that the time records he introduced, and in particular, the hand scanner records he introduced, could not be relied on to capture the

---

[4] The Second Circuit, in *Kuebel v. Black & Decker*, 643 F.3d 352, 363 (2011), ruled that the burden shifting rules of *Anderson* apply even where the employee submitted false time records and could only estimate his hours worked, where a manager of the company knew of the work being done and had instructed the employee not to include the hours at issue in his time sheets. Here, the Manager knew of the work being done and signed off on the time sheets that Mr. Gyalpo submitted. RA 9, Gyalpo Decl. at ¶ 11.

hours worked by floaters who substituted for the regular shift workers. RA 26, Evid. Hr'g Tr. 95:24-96:13. Because Mr. Gyalpo was a "floater," the evidence submitted failed to establish that the employer met its burden of producing complete accurate records under *Anderson*. As a result, once Mr. Gyalpo provided his best recollection of the hours he worked and of his pay, the *Anderson* decision placed the burden of disproving his testimony squarely on the Debtor's shoulders. It did not meet that burden.

The Debtor's records reveal that not all employees used the hand scanners on which the Debtor relied to determine payment of wages. RA 26, Evid. Hr'g Tr. 95:14-96:13. Indeed, the records support Mr. Gyalpo's testimony that he had not used the hand scanners. RA 9, Gyalpo Decl. ¶ 14; RA 26, Evid. Hr'g Tr. 74:1-2. For example, in Debtor's Exhibit 4, the handwritten weekly schedule for the week ending November 7, 2014, shows that three employees—"Santosh", "Kumar Sharma", and "Sujay"—worked at the Centereach gas station during that week. *See* RA 28. However, the hand scanner or time clock entries for that same period only show two employees—"Sharma Kumar" and "Sharma Santosh." *Id.* Similarly, only those two employees' paycheck stubs are included in the records for this time period. *Id.* The General Manager speculated that this discrepancy existed because the third employee, a gas station employee, worked at different locations and was paid by some other location, RA 26, Evid. Hr'g Tr. 96:2-13, but the General Manager offered no specific information identifying which location had paid that employee or any documentation to support his speculation. The General Manager, who was responsible for payroll, did not know who paid this third employee. *Id*. at 96:6-7.

Many of the other pay periods are similar in this respect, according to the records submitted by the Debtor. Thus, the time clock entries appear only to have been used by "regular" employees of a gas station, but a "floater" or substitute employee, such as Mr. Gyalpo,

apparently did not use the time clocks. The General Manager never directly supervised night shifts at Holbrook, RA 26, Evid. Hr'g Tr. 84:12-14, and thus lacked personal knowledge of who was working at that site at night. The timesheets received from the Manager and the inconsistently-used time clocks were the only means in the record by which the General Manager would know who worked a night shift at Holbrook. Without being able to rely on the hand scanner records for "floaters," the Debtor was unable to establish that the time sheets it received from the Manager were somehow more reliable than the ones produced by Mr. Gyalpo with the Manager's signature.

In addition, the Debtor did not even proffer documents to dispute that Mr. Gyalpo had worked at the Centereach gas station in 2013. RA 26, Evid. Hr'g Tr. 96:14-25. The Debtor failed to produce any time or pay records for that period.

Given the above flaws and gaps in the Debtor's evidence, it was error for the Bankruptcy Court to conclude that the Debtor had established that it had a protocol for recording hours and paying wages. Quite to the contrary, the Debtor established that it lacked a consistent protocol for recording the hours of and paying wages to floaters like Mr. Gyalpo. Under *Anderson*, the failure to produce reliable time and pay records shifted the burden on to the Debtor to disprove Mr. Gyalpo's testimony concerning his hours and wages. Because the Debtor failed to meet its burden, the Bankruptcy Court should have credited Mr. Gyalpo's testimony.

[*Remainder of page intentionally left blank*]

## CONCLUSION

For the reasons stated above, the decision of the Bankruptcy Court should be reversed and an order entered allowing Mr. Gyalpo's claims in full.

Dated: September 6, 2016
       New York, New York

Respectfully submitted,

THE LEGAL AID SOCIETY

By: /s/ Richard Blum
SEYMOUR JAMES, Attorney-in-Chief
ADRIENE HOLDER, Attorney-in-Charge,
  Civil Practice
KAREN CACACE, Director,
  Employment Law Unit
RICHARD BLUM, of counsel
199 Water Street
New York, New York 10038
Tel: 212-577-3648
Fax: 646-616-4648
rblum@legal-aid.org

-and-

KAYE SCHOLER LLP

By: /s/ Scott D. Talmadge
Scott D. Talmadge, Esq.
Holly M. Martin, Esq.
Kara E. Neaton, Esq.
250 West 55th Street
New York, New York 10019-9710
Tel: 212-836-8000
scott.talmadge@kayescholer.com

*Attorneys for Sonam Gyalpo*

18